Motions denied, with $10 costs to defendant in each action.

(38 Misc. Rep. 524.)

### In re FEIERABEND et al.

#### (Surrogate's Court, Kings County. July, 1902.)

1. ADMINISTRATOR—ACCOUNTING.

Where an administrator wrongfully used his power to get control of his intestate's business, and also his business premises, at less than their full value, and failed to account for some of the assets of the estate, he will be surcharged on an accounting with the amount of his devastavit.

In the matter of the settlement of the accounts of Sadie E. Feierabend and another, administrators. Objections to accounts. Sustained.

Hamilton & Beckett, for Sadie E. Feierabend, administratrix.
Michael F. McGoldrick, for John H. Collins, administrator.
J. Frank Yawger, for United States Guarantee Co.
Andrew Macrery, in pro. per., special guardian, for infants Lawrence W. Collins and Gilbert Collins.
B. S. Briody, for Andrew Macrery, special guardian.

CHURCH, S. The deceased died, leaving a widow, Sadie E. Collins, and two infant children. The widow, Sadie E. Collins, and a brother of the deceased, one John H. Collins, were appointed the administrators of the deceased's estate, and their accounts were presented for settlement. The special guardian appointed by the court raising certain objections to the accounts started the widow upon an inquiry, which has resulted in this hearing, in which the administratrix has come before the court, filing objections to the account, on the claim that it was procured from her through fraud; and also

making the contention that her co-administrator, John H. Collins, has been guilty of misconduct as administrator, and should be chargeable with an amount in excess of that stated in the account. The deceased was the owner of a jewelry store on Fulton street, in Brooklyn, carrying a stock ranging from $25,000 to $30,000, and doing a prosperous business. At the time of his death the store was well stocked with various articles of jewelry, including what is known as "loose goods," which is understood to mean diamonds and other precious stones which are unset. It appears that a lawyer in this city, one B. F. Chadsey, had attended to some legal transactions for the deceased, and after the death of the deceased the widow suggested that Mr. Chadsey would be a proper person to attend to the affairs. Upon going to the office of Mr. Chadsey in company with her brother-in-law, Mr. John H. Collins, she there met Mr. George L. Weed, a representative of a surety company, and it was represented that it would be an advantage to her to have her associate, Mr. Collins, with her in the administration of the estate. Accordingly the papers were prepared for that purpose, a bond was procured from the surety company, and letters of administration were issued to her and John H. Collins. John H. Collins thereupon entered into the charge of the store and the selling of the goods therein. The evidence satisfies me that Chadsey, Weed, and Collins have deliberately victimized this woman and this estate, and that this has been accomplished by bad advice and outrageous overcharges on the part of this attorney, and by deliberate misconduct on the part of Collins. This attorney did not in any way advise these parties as to their power to conduct said business. He gave no advice as to what should be done to close the estate. He did not inform them that there was a proper method (provided by law) of having such estate appraised, or give any of the very necessary advice which an administratrix, and particularly a young woman, unversed in the business matters of the world, would necessarily require; and yet this attorney has the effrontery to produce here a bill for his services rendered in obtaining these letters of administration for the sum of $350, although it was perfectly well known to this attorney that persons coming to the surrogate's court can get letters of administration issued without any charge being made. Where there is a difference as to the value of an attorney's bill, and it covers a large amount of work, extending over a large period of time, there is, of course, room for discussion; but there can be no possible mistake or misunderstanding where we find a charge of $350 made for simply procuring the letters of administration to a widow, where there is no necessity of issuing any citations or any complicated proceedings therein; and an attorney who makes any such overcharge violates the rights of his client, and his conduct is more contemptible than that of a thief, because he does it under the guise and form of law, and because he is a party to whom a person has a right to look for advice and protection.

If this was the only mistake of this attorney in connection with this matter, it would merit the above condemnation; but considera-

tion of the entire conduct of this attorney in this matter shows that he was utterly devoid of a sense of duty or decency toward this woman, or toward these infant children, and was solely bent on personal pelf. It appears that he and Weed, the agent of this surety company, had offices together, and that a short time subsequent to the issuance of the letters of administration Mr. Weed became the representative of another surety company. For the evident purpose of assisting Weed in making a good record with the new company with which he had become associated, this attorney, Chadsey, advised this administratrix that it was necessary for her at that time to take out letters of guardianship upon her children's estate, and she thereupon took out such letters, and procured the necessary bond from Weed from the new surety company; and this at a time when there had been no pretense of settling the estate, and when not one dollar was likely to come into the hands of this woman as the guardian of such children for a long period of time yet to come. The administratrix here was told that she should personally make up an inventory of the stock of jewelry in the store, and thereupon, with such assistance as she could get, she made up an inventory of such assets, and fixing the cost price thereon to the deceased. The total amount of this inventory was the sum of $24,603.42. John H. Collins, acting as manager of said store, continued to do business therein until the 12th of September, 1901. The various sums of money which were received from said store were delivered to George L. Weed, acting as agent of the surety company, and were by him deposited in the Kings County Bank. It appears that the total moneys deposited from receipts during this period amounted to the sum of $7,441.42. At that time the entire balance of the goods in the store were sold by John H. Collins, in connection and collusion with the said attorney, Chadsey, to a firm known as Jacobs & Co., for the sum of $13,820. I will first take up the conduct of such business down to the date of September 12th, when this sale was made of the goods in bulk. John H. Collins, during his conduct of such business, was in possession of the stock of jewelry in the store, and had the access to the safe. The employé whom the deceased had retained in the place was discharged by John H. Collins, and other persons were employed. It is my belief, from a careful inspection of this evidence, that John H. Collins systematically converted to his own use portions of this stock, and, while it is impossible to particularize in detail the amount which was so taken, I am convinced that he is chargeable with at least the sum of $5,000. It appears here beyond dispute that there was considerable loose goods in this stock in Daniel M. Collins' store. Some of the witnesses place the value as high as $3,000 to $4,000. Even by the inventory John H. Collins stated that there was nearly a thousand dollars worth of loose goods. It does not appear that there was any specific sale of loose goods. The nearest approach that John H. Collins can give to this is the statement that he had some of the loose goods made up into orders; but this amount, according to his own figures, for the completed pieces, only approached the sum of $300 to $400.

There were no loose goods on hand at the time the sale of the property in bulk took place on the 12th of September. At the time of the sale in bulk the price realized was about 15 per cent. less than the cost value of these goods. If we add, therefore, to the $13,820 this 15 per cent., and also take 50 per cent. of the sum of $7,741.42, we have the sum of about $19,000,—at least $5,000 less than the inventoried value, which it is conceded by everybody was practically correct. It thus seems to be fairly demonstrated that John H. Collins has abstracted $5,000 worth of cost value of goods from this stock, and, in addition, we have the evidence tending to show that he had access to the stock before this inventory was made up, and therefore had opportunity of taking the same, and of which there is no trace. There are other corroborative circumstances, which show that John H. Collins has appropriated some of this money. Previous to his taking charge of this store he had apparently no definite, fixed business; but a year before he had been acting as a car conductor, and the court is warranted in taking notice of the fact that the average daily wages of a car conductor is $2. He had, at times during the rush season, assisted his brother in running the store as a clerk, but had never engaged in any stated and continued occupation; and yet we find him, when the stock of goods in the store are to be sold in September, enabled to start a jewelry store on these premises, and pay a considerable amount of money on account thereof. Upon being questioned as to where he had the money, etc., and of his income, he pretended that he had some account with a concern on Broad street, which he had closed out a few days before his brother's death, from which he received $2,000. This money was made up of bills of different denominations,—hundreds, fifties, tens, twos, and ones,—and this money he had carried in his pocket all the time until the sale of the stock was had, and he had arranged to establish a jewelry store there himself. The idea of a man closing an account and carrying this amount of money on his person for such a period of time is, to say the least, a somewhat flimsy and doubtful story. The improbability of it, however, is more clearly shown by other statements of this witness. When he was compelled to produce his bank account, it showed that he had opened an account early in August, depositing a considerable sum of money, yet, when shown this bank account, he did not change his evidence that he had carried this cash, which he had received from New York, on his person until September. Upon being pressed as to where he raised the money which went into this bank account, he pretended that he had won $3,000 upon betting on a horse race. If that is so, it is difficult to see why the money which he had received from a legitimate investment, as he pretends, was carried in his pocket, while he opened a bank account with the proceeds of his horse-racing adventures. The importance of showing that Collins was in receipt of an income is evidenced by the fact that his counsel endeavored to substantiate him in this respect by putting a man on the witness stand who claimed that he had seen Collins win $1,100 on a certain horse race in June. The disparity between this statement and the statement of Collins

is worthy of comment, but the fact of Collins endeavoring to show his source of income by endeavoring to prove what he won on the races, and yet neglecting to bring the persons from this banking establishment in Broad street, whose books would unquestionably have shown the items to a cent, is proof either that there was no such account, or that it was not of the dimensions stated by Mr. Collins. In addition, we have this man Collins, at about the time that this final sale was consummated, residing in the Clarendon Hotel, a prominent and expensive establishment in this city; whereas, previous to his acting as administrator and manager of this store, he had boarded in different places at apparently modest and moderate prices. The shrinkage in this estate and the additional expenditures of Collins accruing simultaneously, and during his management of the entire matter, accompanied by the mathematical demonstration heretofore made, leaves no doubt in the mind of any disinterested person that he utilized his position to his own advancement, and to charge him with $5,000 is charging him with a minimum, rather than a maximum, sum.

As to the sale of the stock, fixtures, and good will of this store: The sale of this stock and the fixtures in this store was, under the circumstances, to say the least, suspicious. Instead of John H. Collins endeavoring to dispose of the stock, fixtures, lease, good will, and other things appertaining to the business of a growing concern, he advised Mrs. Collins, in August, that the lease could not be assigned, and that, if there was any attempt to do this, the estate would lose $800, but that the landlord would make a new lease to him, and relieve the estate of any expenditure, and thereupon he had a new lease made to himself for five years and eight months from the 1st of September, at the same rental, and gives this as an excuse for his taking the lease. Where a reason which is given for an act seems to be a flimsy excuse, we are justified in imputing that the act was done for improper purposes. Here we have this man pretending that a lease which had but eight months to run, and upon which the entire rent would be but $1,000, would have, if assigned, necessitated a forfeiture to the landlord of $800. Without attempting to consult counsel as to the probability of this fact, this man pretends that to relieve this estate of this small sum of money he was willing to take a lease of five years and eight months of these premises, and take the chances of conducting a jewelry business there, which he never had anticipated doing until that time; in other words, that he secured a lease, upon which he would have to pay nearly $9,000, and also assumed all the risk of conducting a jewelry business, which he had never expected to conduct until that time, to relieve the estate from a claim of but $800. There is no pretense that by taking this lease he was getting some bargain on the rental, because the witness interposed by the surety company here shows that the rental value of such premises was but $1,500 a year. This is therefore an incredible story, and the actions of this man are only to be explained upon the hypothesis that having, by his conduct of the business, acquired enough cash to enable him to conduct the business himself,

he now planned to get control of this lease and the good will of this business, and when he is confronted with a claim of his misconduct he seeks to evade the same by this excuse. Certainly, before executing this lease, it would have been the most natural thing in the world for him to have endeavored to dispose of the balance of the stock; yet no effort was made, except when he got this lease in his own name, so that he could be prepared to compel his coadministrator to sell this stock; and when the customer who subsequently purchased it in bulk (who, by the way, was procured by Mrs. Collins) came to negotiate on the matter the customer was informed by Collins, whose duty it was to obtain a good price, that this property had to be sold, and thereupon he and Chadsey proceeded with and completed this sale, without consultation with Mrs. Collins, and so anxious were they to complete the sale that Chadsey signed the memorandum and also the bill of sale as attorney for Mrs. Collins. It may be stated, in passing, that this act of Chadsey's was a most flagrant violation of his obligation to his client, and appears to have been made absolutely without authority, either in fact or in law. After this sale was completed, Collins thereupon told Mrs. Collins that he would pay $600 for the fixtures, and made a large claim for his services as manager, and thus paid the $600. Thus he was put in possession of a store which had for years been run under the name of Collins, with a set of fixtures which he got for much less than their value, and without the expenditure of one cent, except what he actually paid for new goods. Thus this estate, which had an inventoried cost value of jewelry of $24,000, and with the fixtures, lease, and good will, instead of receiving at least the cost value of these goods and something for the fixtures, right to the lease, and good will, has realized by the conduct of the business during that period and the bulk sale considerably less than $20,000; and if we deduct the various expenditures during the conduct of the business the net amount which is turned over to the estate is about $15,000. It is my judgment, therefore, that John H. Collins should be charged with the sum of $5,000 on account of the devastavit which he committed in conducting this business.

At the time that the sale was closed it appears that $13,000 was paid by a check, which check, and $820 cash received, was turned over to George L. Weed, who represented the surety company. George L. Weed pretends that he was authorized to turn this money over to Mr. Chadsey on account of his fees, and, although Chadsey attempts to swear that this money was turned over to him, I am satisfied that this is not the fact, but rather that this statement is an afterthought to cover this transaction. Weed's excuse for not depositing this money in the bank with the check, and then paying Chadsey by check, as the other matters had been paid, was that, owing to some misunderstanding with his surety company, he had agreed that after the final sale he should not countersign any more checks, and that, therefore, it was more convenient for Mr. Chadsey to receive the money directly, if the administratrix approved of the same, than to deposit it, and have to wait until the check was ap-

proved by some other person. That this is a pretense, and not a reason, is shown by the fact that a number of checks were countersigned by Weed after this time. Where we have a pretense, instead of a reason, we are justified in assuming and imputing that it was done improperly. This $820 does not correspond to the detailed amount of Chadsey's bill, or any part thereof, and it is in evidence here (not contradicted by Chadsey) that Chadsey, after this account was presented, stated that he had not been paid the amount represented by his vouchers, and that he was putting in such receipted vouchers as a convenience to the estate. It seems to me that this surety company should be directly chargeable with this amount. They have produced Weed here, and put him on the witness stand to explain what he did in connection with this matter. They have proved that he was attending upon this sale to represent the interests of the surety company, so that he could check any improper acts of these administrators, for which the company was liable. When the administrators turned over to him the proceeds of this sale, they turned it over to the surety company, and, if there is misfeasance therein, the surety company is liable.

It is unnecessary for me to comment further upon the conduct of Chadsey and Weed, except that where this man Chadsey has been shown to be guilty of the various improprieties that he has committed here it is readily conceivable that this account was made up in the manner described by the administratrix, viz., that her signatures were procured in blank to the various sheets, and that they were filled in afterwards by Chadsey. She is corroborated by her sister. In addition, it appears that the line upon which her signature was placed was in each instance at the foot of the page, whether there was much or little written upon that page,—an unusual method of procedure, and which is only explainable upon her theory. In addition, the notary who took these acknowledgments at the time stated not only is contradicted by his own acknowledgment as to the petition bearing a different date, but it also appears by considerable outside evidence that at the very time he maintains that the parties appeared before him they were preparing to attend a social engagement; and that there can be no mistake in their mind on the matter is shown by the production of the printed invitation of that date. There was nothing special which this administratrix desired to gain by making this statement as to the method of making this account. It is simply stated by her as the facts of the transaction. And that this woman is corroborated in this is shown by her undenied statement that she was endeavoring to get some adjustment of her affairs, and had come to the former surrogate, with a letter from a friend of hers, who occupied the position of surrogate in some other county, but had been assured by Mr. McGoldrick, who was then clerk of the surrogate's court, and who represented John H. Collins, that Mr. Chadsey would correctly attend to her affairs. The importance of this statement, to my mind, is this: That previous to the commission of these acts it shows that the administratrix was dissatisfied with the conduct of Chadsey and Collins, and was endeavoring, in the best way that she, a woman not used to business ways, knew

how, to compel Chadsey to do his duty, and close up her matters in a proper and legal way.

The judgment in this case may restore to this woman and these infant children some portion of the property of which there has been this attempt to defraud them, but it is my belief that a conscientious, businesslike administration of the affairs of this estate would have resulted in very much better results than any decision of this court can effectuate. The counsel who now represent this administratrix deserve the highest credit for the skill, industry, and fidelity with which they have conducted this hearing, and have greatly assisted the court by the clear and systematic manner in which the facts have been presented.

Decreed accordingly.